No. 25,216.

JAMES CALVIN et al., *Appellees*, v. CHARLES E. SCHAFF, Receiver of THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

RAILROADS—*Negligence—Personal Injury—Evidence—Special ·Findings—Head-lights on Engines*. The plaintiffs seek a recovery for the death of their son caused by the negligent operation of a train at a street crossing. The proceedings considered, and *held*: (*a*) The evidence was sufficient to sustain the general verdict and special findings. (*b*) The special findings were not so inconsistent with the general verdict or with each other as to require judgment for the defendant. (*c*) The question of contributory negligence was one of fact for the jury. (*d*) A rule of the interstate commerce commission requiring the display of headlights on engines used in road service between sunset and sunrise in interstate commerce is imperative and not discretionary with the engineer or operator in charge. (*e*) Other alleged errors considered and held not to be of substantial merit.

Appeal from Bourbon district court; EDWARD C. GATES, judge. Opinion filed · April 11, 1925. Affirmed.

*W. W. Brown, C. E. Pyle*, both of Parsons, and *Douglas Hudson*, of Fort Scott, for the appellant.

*A. M. Keene*, and *Harry W. Fisher*, both of Fort Scott, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for damages resulting from the death of John Wesley Calvin, which occurred in a collision between an automobile in which he was riding and one of defendant's passenger trains. The plaintiffs recovered and defendant appeals.

This is a second appeal to this court. When here before the judgment was reversed because of an error by the trial court in instructing the jury with reference to the time of sunset. (See 113 Kan. 103, 213 Pac. 814.) The facts, briefly, were as follows:

The deceased operated a sawmill at Richards, Mo., a short distance northeast of Fort Scott. George Limbaugh worked for Calvin at the mill. On December 20, 1920, there was a breakdown of the mill machinery, and Limbaugh brought Calvin to Fort Scott in his (Limbaugh's) car to get a piece of machinery repaired. They started to return to Richards shortly after 4:30 o'clock the same evening, and were struck by defendant's train at a crossing in the northeastern part of Fort Scott a little after five o'clock. Calvin

was killed. On conflicting evidence the jury returned a verdict for plaintiffs in the sum of $2,500 and answered special questions as follows:

"Submitted by Defendant.

"1. What effort, if any, did the deceased make, on approaching the crossing, to prevent the collision? A. He looked.

"2. Was the automobile trip taken by Limbaugh and the deceased jointly, for the purpose of securing repairs for the sawmill belonging to the deceased? A. No.

"3. At what rate of speed was the automobile moving when it was twenty to twenty-five, feet of the crossing? A. Ten miles per hour.

"4. At what rate of speed was the train traveling as it approached said road crossing when it was at the following points:

(1) Twenty feet distant? A. Twelve miles per hour.

(2) Fifty feet distant? A. Eighteen miles per hour.

(3) One hundred feet distant? A. Twenty miles per hour.

"5. What was the exact time of the collision in standard time? A. Five o'clock and five minutes p. m.

"6. In what distance could Limbaugh have stopped his automobile when approaching said crossing and when traveling as follows:

(1) At five miles per hour? A. Three to four feet.

(2) At fifteen miles per hour? A. Ten to fifteen feet.

"7. How far could the deceased have seen the train approaching had he looked when he was at the following points:

(1) Twenty feet south of crossing? A. Thirty feet.

(2) Fifty feet south of crossing? A. Couldn't have seen it at all.

"8. What prevented the deceased from hearing the approaching train before the automobile was driven upon the crossing? A. Not making sufficient noise.

"9. Was the daylight sufficient at the time of the collision for deceased to have seen the approaching train had deceased looked at any time after he was within fifty feet of the crossing? A. No.

"10. If you find for the plaintiff, upon what ground or grounds of negligence do you base your verdict? A. Running after daylight without lights.

"Submitted by Plaintiffs.

"Q. 1. Was there a headlight burning upon the locomotive in question at the time of the alleged collision? A. No.

"Q. 2. Did the collision in question occur after sunset? A. Yes.

"Q. 3. Was John Wesley Calvin using reasonable care for his own protection at the time the automobile in question approached and was crossing the railroad track of the defendant at the time of the alleged collision? A. Yes.

"Q. 4. Was the train at the time of the alleged collision traveling at a greater rate of speed than ten miles per hour? A. Yes.

"Q. 5. Did the train make sufficient noise so that John Wesley Calvin could have heard it in time to have avoided the collision? A. No."

The principal controversy was whether it was dark enough to require an illuminated headlight and whether the deceased was guilty of such contributory negligence that recovery is barred. It would serve no useful purpose to set down and analyze the evidence, though some of the pertinent facts may·be noted. There was substantial evidence that it was a dark, cloudy evening. The repair shop had been lighted for a considerable time before 4:30. As Limbaugh and Calvin drove through Fort Scott on their way, the stores were lighted. Limbaugh testified that before they reached the railroad crossing where the wreck occurred, it was so dark that he could see only a few feet around his car. While he was more or less familiar with the road as it approached the railroad crossing, there was no evidence that Calvin, the deceased, ever saw the crossing before the time of the wreck. The official government weather observer at Fort Scott testified, and his records were introduced, which records showed it to be a dark, stormy evening with heavy overhanging clouds. Harry Warren, the county attorney, testified that it was so dark at ten minutes before five o'clock that he could not see in his office without artificial light, although his office had large windows and his desk was three feet from the window.

There is a curve to the north in the defendant's track east of the crossing in question, so that one approaching the crossing from the south can see only the front of an engine approaching from the northeast; the broad side of a train is not visible.

The engineer testified that as he approached the crossing he was running at a speed of twelve or fifteen miles an hour—not over 15 miles; that the fireman was on his seat box in the cab on the left side, looking ahead; that "the fireman holloed just as we approached the crossing. We were not over thirty feet. . . . He said, 'Look out!' and just about that time I seen the automobile coming out on my side. . . .

"Q. You weren't over thirty feet from the crossing when the fireman holloed to you—is that right? A. Yes, sir; that is right. . . .

"Q. Now, as you came down to that crossing, you say it is a pretty steep grade down toward the Shute street crossing? A. Yes, sir.

"Q. You say when you put on the brakes that they don't make any noise. They slip along very quietly when you graduate them as you did; isn't that true? A. Yes, sir; that is true."

The fireman, who was on his seat in the cab, testified:

"Q. Upon the seat, were you? A. Yes, sir.

"Q. Keeping a lookout ahead? A. Yes, sir. As we got close to the crossing I seen an automobile, and I said, 'That'll do,' and Mr. Bowser [the engineer] made an application of the emergency brakes. I was on the left side of the engine when I first saw the automobile on Shute street, approaching the crossing, sitting on the seat box."

The defendant admits that the train was running at a rate of speed not permitted by the city ordinances; that it was running after sundown without an illuminated headlight, as required by the rules of the interstate commerce commission, but contends that the deceased was guilty of contributory negligence—that he failed to look and to listen. It argues that this court should take judicial notice that the tragedy occurred in daylight; that the findings of the jury were contrary to the laws of nature, etc. On the other hand, the plaintiffs contend that the outstanding cause of the tragedy was the failure of the engine to carry an illuminated headlight. The evidence, abundant on both sides, was conflicting. The function of the jury was to ascertain the facts. The jury found the deceased was a guest of the driver of the automobile. Therefore the neglect of the driver of the automobile is not imputed to the deceased. (*Kessler v. Davis,* 111 Kan. 515, 207 Pac. 799; *Clark v. Railroad Co.,* 115 Kan. 823, 224 Pac. 920; *McRae v. Railroad Co.,* 116 Kan. 99, 225 Pac. 1032.) Under all the circumstances, the question of contributory negligence of the deceased was properly submitted to the jury for determination. (*Fike v. Railway Co.,* 90 Kan. 409, 133 Pac. 871; *Deister v. Railway Co.,* 99 Kan. 525, 162 Pac. 282.)

*Fort Smith & Western Railway Co. v. Messek,* 96 Ark. 243, was a case where the plaintiff, with a companion, started about seven o'clock in the evening of a day in September, just after sunset, to drive across defendant's street crossing, over which seven railroad tracks were laid. They were struck, and plaintiff was injured by one of defendant's engines, which was propelled over the crossing without a headlight, without signal or noise of any kind. It was held that the defendant was negligent and that the question of plaintiff's contributory negligence was for the jury.

*Hines v. Chicago, M. & St. P. R.,* 105 Wash. 178, was a case where plaintiff was struck by a locomotive moving rapidly backward without lights. It was held that the question of plaintiff's contributory negligence was for the jury. (See, also, 23 A. & E. Encyc. 573; *Mills v. Waters,* 198 Mich. 637; *Ommen v. Grand Trunk R.*

*Co.,* 204 Mich. 392; *Hudson v. Grand Trunk Western R. Co.,* 227 Mich. 1; *Fox v. Detroit United Railway,* 218 Mich. 5; *Gorton v. Harmon,* 152 Mich. 473; *McClure v. Wilson,* 109 Wash. 166; *St. Louis I. M. & S. Ry. Co. v. Prince,* 101 Ark. 315; *L. & A. Ry. Co. v. Woodson,* 127 Ark. 323.)

The defendant contends that the special findings of the jury nullified the general verdict. Ordinarily, where a question of inconsistency arises between findings made in answer to special questions and a general verdict, every reasonable presumption is in favor of the general verdict. (*Morrow v. Bonebrake,* 84 Kan. 724, 115 Pac. 585; *Lewellen v. Gas Co.,* 85 Kan. 117, 116 Pac. 221; *Wise v. Lillie,* 84 Kan. 86, 113 Pac. 403.) A general verdict and special findings should always be harmonized if possible. (*Seeds v. Bridge Co.,* 68 Kan. 522, 75 Pac. 480; *Hollingsworth v. Berry,* 111 Kan. 730, 207 Pac. 841, and cases cited.) There is no difficulty here in harmonizing the general verdict and special findings.

Sunset on the day of the collision was one and one-half minutes after five o'clock. There was evidence from which the jury might have concluded that the collision occurred any time between 5 and 5:10 p. m. The finding was that it occurred at 5:05. The defendant contends that the court erred in giving instruction No. 13, which reads:

"You are instructed that the train which collided with the automobile in which John Wesley Calvin was riding was an interstate train, and you are instructed that the following rule made by the interstate commerce commission was in force governing the matter of headlight upon the engine in question in this case at the time of the alleged injury, to wit:

" '29. *Locomotives used in road service.* Each locomotive used in road service between sunset and sunrise shall have a headlight which shall afford sufficient illumination to enable a person in the cab of such locomotive, who possesses the usual visual capacity required of locomotive enginemen, to see, in a clear atmosphere, a dark object as large as a man of average size standing erect at a distance of at least 800 feet ahead and in front of such light; and such headlight must be maintained in good condition.'

"And you are instructed that an illuminated headlight is required to be maintained on all engines operating in interstate commerce between states, not only for the protection of those on the train and handling the train, but also for the benefit of persons on the track or approaching it, from sunset to sunrise, in order that they may be apprised of the location or approach of said engine. And you are instructed that it is negligence on the part of one operating an interstate train to operate said engine and train after sunset and before sunrise without a headlight. And in this connection I instruct you that if you find from the preponderance of the evidence that the defendant

Calvin v. Schaff, *Receiver*.

operated said interstate train over the crossing in question without main-
taining such a headlight after sunset on said day, that such action on his part
would be negligence, and if such negligence was the proximate cause of the in-
jury and death of said John Wesley Calvin, then the defendant would be
liable unless you further find that the said John Wesley Calvin was guilty of
contributory negligence as herein elsewhere defined."

The defendant argues that the order of the interstate commerce
commission requiring headlights relates only to their installation
and inspection, and does not import that the illumination produced
by the headlight must be continuous between sunset and sunrise;
that the operator in charge of the headlight is only required to use
it during the part of each twenty-four hours that is covered by
actual necessity.

We are unable to concur in the defendant's contention. The
evident intention of the interstate commerce commission was to re-
quire the use of the headlight between sunset and sunrise, and not to
leave the matter of its use to the discretion or judgment of the engi-
neer in charge. The language of the rule is neither indefinite nor
uncertain. Had the commission intended that the headlight be used
only according to the judgment of the engineer or operator in charge,
appropriate language expressing that intention would have been
used. Other requirements in the rules indicate an intention not to
leave the use of the headlight to the discretion of the operator in
charge. Another paragraph of rule twenty-nine reads:

"Each locomotive used in road service which is regularly required to run
backward for any portion of its trip, except to pick up a detached portion of
its train, or in making terminal movements, shall have on its rear a head-
light which shall meet the foregoing requirements. Such headlights shall be
provided with a device whereby the light from same may be diminished in
yards and at stations when meeting trains. When two or more locomotives
are used in the same train, the leading locomotive only will be required to
display a headlight."

Rule thirty-one reads:

"*Locomotives used in yard service.* Each locomotive used in yard service
between sunset and sunrise shall have two lights, one located on the front of
the locomotive and one on the rear, each of which shall enable a person in
the cab of the locomotive under the conditions, including visual capacity, set
forth in rule 29, to see a dark object such as there described for a distance
of at least 300 feet ahead and in front of such headlight; and such headlights
must be maintained in good condition."

A Kansas statute (R. S. 66-261) requires, among other things,
that every locomotive engine being operated in road service within

202 SUPREME COURT OF KANSAS.

the state shall be equipped with and use a headlight of a power that will outline the figure of a man on or adjacent to the track plainly visible at a distance of 800 feet preceding the locomotive. The visibility is understood to be measured by and under ordinary night conditions. It provides that the act shall not apply to locomotives used exclusively between sunup and sundown.

In *Becke v. The Mo. Pac. Ry. Co.*, 102 Mo. 544, 552, in speaking of the necessity for headlights on moving trains, the court said that they are—

"A common and necessary means adopted by all railroad companies for the protection alike of those rightfully on the train, and on the track, or approaching it in the nighttime. No engine is constructed without such a light, and no train is run in the nighttime by any railroad company under any ordinary circumstances without having it lighted. This is a fact known to all reasonable minds by common experience, and the court committed no error in declaring that it was negligence if the defendant's servants failed to have such a light lighted and burning at the time of the collision." (See, also, *Gorton v. Harmon,* supra; *Burling v. I. C. R. R. Co.,* 85 Ill. 18; *Griffin v. R. R.,* 166 N. C. 624; *B. & O. S. W. Rly. Co. v. Alsop,* 176 Ill. 471; *Chicago, &c., R. Co. v. Coon,* 48 Ind. App. 675.)

The foregoing disposes of the principal contentions of the defendant. To discuss others would unduly lengthen the opinion. We have given consideration to the other complaints urged by the defendant, but find no error that would warrant a reversal.

The judgment is affirmed.